IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KENNETH R. KNOWLES, Individually and as
Administrator of the Estate of Lori Renee
Knowles,

     Plaintiff,

v.

OFFICER JASON MICHAEL HART,

     Defendant.

Civil Action No.
1:18-cv-01394-SDG

## ORDER

This matter comes before the Court on Defendant's Motion for Summary Judgment [ECF 25]. For the reasons set forth below, the motion is **GRANTED**.

## I.  BACKGROUND

### a.  Facts

The undisputed material facts, construed in a light most favorable to the nonmoving party, are as follows. On July 24, 2014, Lori Knowles[1] called Henry County 911 multiple times.[2] The 911 operator had difficulty understanding

---

[1]  For purposes of this Order, "Knowles" will refer to Lori Knowles. "Plaintiff" will refer to Kenneth Knowles, individually and as administrator of Lori Knowles's estate.

[2]  ECF 25-5, ¶¶ 1, 4.

Knowles as she was yelling and screaming and somewhat incoherent.[3] Knowles did not identify herself, but she indicated that she had taken too much medicine.[4] Defendant Officer Jason Hart and Officer Goetz were dispatched to Knowles's address.[5] The dispatcher informed the officers that the caller was an unknown female who was incoherently yelling and screaming and had reportedly taken too much medication.[6]

Officer Hart and Officer Goetz were in uniform when they arrived.[7] The officers knocked on the front door of the house numerous times and loudly announced "police," but no one answered.[8] Officer Hart told Officer Goetz that he heard someone screaming inside.[9] Officer Hart believed the female screaming seemed distraught and in danger.[10] Unable to see anything through the windows in the front of the house, the officers went to the back of the house.[11] Officer Hart

---

[3]   *Id.* ¶¶ 2, 4, 7.

[4]   *Id.* ¶¶ 2, 4.

[5]   *Id.* ¶¶ 6, 8.

[6]   *Id.* ¶¶ 7–8.

[7]   ECF 25-6, at 13; ECF 27 (Goetz Dep. Tr., Ex. 2), at 158.

[8]   ECF 25-5, ¶ 11.

[9]   *Id.* ¶ 12.

[10]   *Id.* ¶ 14.

[11]   *Id.* ¶ 18.

knocked on the back door.[12] The officers heard a female voice from inside, yelling and screaming "f--- you" among other things, but the officers could not comprehend all that was being said or to whom it was directed.[13] The officers attempted to open the back door and found it to be locked.[14]

The officers considered the situation to be an emergency.[15] Accordingly, they informed their supervisor, Sergeant Lyle, and he agreed with the officers' assessment that they should make a forced entry.[16] Sergeant Lyle advised them to wait until the paramedics arrived on the scene.[17] When the paramedics arrived, they gave the officers a tool to open the back door.[18] The officers and paramedics went to open the back door, where they could still hear the female yelling and screaming inside.[19]

---

[12] *Id.* ¶ 19.

[13] *Id.* ¶ 20.

[14] *Id.* ¶ 21.

[15] *Id.* ¶¶ 22–23.

[16] *Id.* ¶ 24.

[17] *Id.* ¶ 25.

[18] *Id.* ¶¶ 26–27.

[19] *Id.* ¶ 28.

Upon entering the house, Officer Hart saw a large, closed gun safe in the living room.[20] The officers could hear the woman yelling "f--- you" from down the hallway.[21] They proceeded down the hallway, towards the sound of the woman's voice.[22] As they reached the end of the hallway, Officer Hart stepped toward a bedroom to his right and looked inside.[23] At this point, Officer Hart was in the threshold of the bedroom door and Officer Goetz was behind him.[24] Officer Goetz was able to see into the bedroom via a mirror hanging on the wall.[25]

Inside the bedroom, Officer Hart saw a female, later identified as Knowles, lying face down on her bed with a black handgun inside a holster strapped to her right hip.[26] Officer Hart advised Officer Goetz about the gun and yelled for Knowles to show her hands.[27] As he did so, Officer Hart drew his service weapon and positioned it at a low ready position.[28] In this position, the gun was pointing

---

[20]   *Id*. ¶ 30; ECF 26 (Hart Dep. Tr.), at 93:8–19, 96:14.

[21]   ECF 25-5, ¶ 31.

[22]   *Id*.

[23]   *Id*. ¶ 36.

[24]   ECF 25-2, ¶ 10.

[25]   *Id*.

[26]   ECF 25-5, ¶¶ 37, 38.

[27]   *Id*. ¶ 39.

[28]   *Id*. ¶ 40.

towards the floor, not at Knowles.[29] After Officer Hart told Knowles to show her

hands, she got up from the bed.[30] Knowles had blood on her face, was yelling and

screaming, and, according to both officers, had an "evil" look on her face.[31]

The parties dispute some of what happened next. However, the evidence

shows that Knowles reached for her gun.[32] From there, it is undisputed that Officer

Hart fired his service weapon once within approximately 15 seconds after his first

---

[29] *Id*. ¶¶ 40–41.

[30] *Id*. ¶ 42.

[31] *Id*. ¶ 43.

[32] Plaintiff disputes whether and how Knowles reached for or touched her gun by citing to allegedly contradictory statements by Officer Hart. ECF 32-9, ¶ 44 (citing ECF 32, at 4–11). While Officer Hart's statements show a conflict over whether Knowles touched her gun, he always reported that she reached for it. In his incident report, Officer Hart stated that he "observed [Knowles] several times reaching down at her waistband where the handgun was located." ECF 32-2, at 2. During the GBI interview the next day, Officer Hart stated that he "noticed her right hand going down towards the gun" and he "noticed her going down for the weapon several times." ECF 32-7 (Hart GBI Recorded Statement), at 8:25–8:40. In his deposition, Officer Hart stated that she "kept reaching down for the firearm." ECF 26 (Hart Dep. Tr.), at 72:14–15. When asked if he would say Knowles actually touched the weapon, he replied, "I would say that. Yes, sir." *Id*. at 75:20–21. However, in his declaration, Officer Hart states, "her hand reached toward the handgun located on her side; from my angle, I could not tell for sure if she was touching it." ECF 25-1, ¶ 31. Further, the only eyewitness testimony available after Knowles got up from the bed is Officer Hart because Officer Goetz lost his visual on Knowles through the mirror at that point. ECF 32-3; ECF 27 (Goetz Dep. Tr.), at 144:21–145:2.

command for Knowles to show her hands.[33] After Officer Hart fired his weapon,

Knowles fell to the floor and Officer Hart rushed to her in an attempt to secure the

handgun.[34] Knowles began kicking, fighting, refusing to cooperate, and

screaming.[35] Officer Goetz came into the room to help Officer Hart get Knowles

under control, but she continued to fight with and scream at the officers.[36]

Eventually, the officers handcuffed Knowles and removed the handgun from the

holster on her side.[37]

Officer Hart asked Knowles if she had been hit and she said yes.[38] A

paramedic found a gunshot wound on her right breast.[39] Knowles continued to

fight while the paramedics strapped her onto a stretcher to be transported to a

hospital.[40] Knowles was taken by ambulance to a local hospital.[41] While en route,

the paramedics gave Knowles anti-psychosis medication, after which she began

---

[33]   ECF 25-5, ¶ 48.

[34]   *Id*. ¶ 49.

[35]   *Id*. ¶ 50.

[36]   *Id*. ¶ 51.

[37]   *Id*. ¶¶ 52–53.

[38]   *Id*. ¶ 55.

[39]   *Id*. ¶¶ 55, 56.

[40]   *Id*. ¶ 57.

[41]   *Id*. ¶ 58.

having seizure-like activity and became unresponsive.[42] Knowles had no vital signs by the time she arrived at the hospital and she was pronounced dead within the hour.[43]

Knowles's autopsy revealed that the gunshot entered her right breast near the center of the chest and exited in the armpit area.[44] The bullet did not enter the chest cavity or travel through the ribs.[45] The medical examiner found that "to a reasonable degree of medical certainty," the gunshot wound was not an independently lethal injury.[46] Thus, with appropriate care, the gunshot wound would not have been life-threatening.[47] The medical examiner determined that many factors contributed to Knowles's cardiac dysrhythmia and death, including: mixed drug intoxication, physical restraint based on her being handcuffed and strapped to the medical stretcher, and a history of bipolar and panic disorders.[48] The medical examiner concluded that the gunshot wound was a possible

---

[42]  *Id*. ¶ 59.

[43]  *Id*. ¶ 60.

[44]  *Id*. ¶ 65.

[45]  *Id*. ¶¶ 65–66.

[46]  *Id*. ¶ 69; ECF 25-3, ¶ 6.

[47]  ECF 25-5, ¶ 70; ECF 25-3, ¶ 6.

[48]  ECF 25-5, ¶ 73; ECF 25-3, ¶ 9.

complicating factor because it would have increased the stress Knowles was already experiencing as a result of her drug-induced psychosis or psychotic episode, but, "it is impossible to determine the degree or level of any increased stress or what effect, if any, it would have had on [her] physiological condition."[49]

### b.     Procedural History

Plaintiff, Knowles's surviving husband,[50] filed this action on April 2, 2018.[51] The Complaint asserts the following claims under Georgia law: battery (Count I), negligence (Count II), wrongful death (Count III), pain and suffering (Count IV), and bad faith (Count V). It also asserts a federal excessive force claim against Officer Hart in his individual capacity, in violation of the Fourth Amendment under 42 U.S.C. § 1983 (Count VI). On March 11, 2019, Officer Hart moved for summary judgment on all counts.[52]  Officer Hart's motion argues that he is entitled to qualified immunity from Plaintiff's § 1983 claim and official immunity from Plaintiff's state law claims.

---

[49]   ECF 25-3, ¶ 10.

[50]   ECF 1, ¶ 2.

[51]   ECF 1. Plaintiff previously filed this action in the State Court of Henry County, Georgia on July 22, 2016. *Id.* ¶ 1. That action was voluntarily dismissed on October 5, 2017. *Id.*

[52]   ECF 25.

Plaintiff's Complaint failed to assert a basis for this Court's jurisdiction. However, since the Complaint asserts a § 1983 cause of action, this Court has jurisdiction over that claim under 28 U.S.C. § 1331. Since the state law claims arise from the same case and controversy as the § 1983 claim, the Court has jurisdiction over those claims under 28 U.S.C. § 1367(a).

## II.   LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324.

In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that party. *Anderson*, 477 U.S. at 255; *see also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the court in evaluating summary judgment. *Anderson*, 477 U.S. at 255. *See also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Summary judgment for the moving party is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.   DISCUSSION

### a.   Qualified Immunity for § 1983 Claim

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983 itself creates no substantive rights. *Baker v. McCollan*, 443 U.S. 137, 140, 144 n.3 (1979). Rather, it provides a "method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Id*. To succeed on a § 1983 claim, the plaintiff "must prove that she was deprived of a constitutionally guaranteed right under color of state law." *Tillman v. Coley*, 886 F.2d 317, 319 (11th Cir. 1989).[53]

Plaintiff alleges that Officer Hart violated Knowles's Fourth Amendment right to be free from unreasonable seizure.[54] *Tennesee v. Garner*, 471 U.S. 1, 7 (1985) (holding that apprehension by use of force constitutes "seizure" subject to Fourth Amendment reasonableness requirement). However, Plaintiff's ability to pursue a § 1983 claim against Officer Hart in his individual capacity is limited by the doctrine of qualified immunity. *Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005).

Qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or

---

[53]   Neither party disputes that Officer Hart was acting under color of state law in responding to the 911 dispatch.

[54]   ECF 1, ¶ 134.

constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity "protect[s] officers from the sometimes 'hazy border between excessive and acceptable force.'" *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (quoting *Priester v. Riviera Beach*, 208 F.3d 919, 926–27 (11th Cir. 2000)). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *City & Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1774 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

In the qualified immunity analysis, the burden is on the government official to show he was engaged in a discretionary function. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1263–64 (11th Cir. 2004). Once shown, "the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity." *Id*. at 1264 (citing *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003)). Here, it is undisputed that Officer Hart was acting within his discretionary authority.[55] As

---

[55]   ECF 32, at 23 ("Plaintiff concedes that the use of deadly force by a police officer involves the exercise of discretion . . . ."); *see also Kenning v. Carli*, 648 F. App'x 763, 767 (11th Cir. 2016) (finding officers were engaged in discretionary duty when they shot plaintiff's son during response to police department call).

such, the burden is on the Plaintiff to show that Officer Hart is not entitled to qualified immunity.

In order to carry this burden, Plaintiff must show that (1) Officer Hart's conduct violated a constitutional right; and (2) the constitutional right was clearly established. *Rodriguez v. Farrell*, 280 F.3d 1341, 1345 (11th Cir. 2002).

### i.    Violation of a Constitutional Right

Whether a police officer's use of force violated a constitutional right is evaluated under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). This reasonableness analysis "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Garner*, 471 U.S. at 8). This test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The Court must assess these factors "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Terry v. Ohio,* 392 U.S. 1, 20–22 (1968)).

The Court must look to the "totality of the circumstances" to "determine whether the force used was justified." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009). Further, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396– 97. Accordingly, "the qualified immunity standard is broad enough to cover some mistaken judgment, and it shields from liability all but the plainly incompetent or those who knowingly violate the law." *Garczynski*, 573 F.3d at 1167 (quoting *Montoute v. Carr,* 114 F.3d 181, 184 (11th Cir. 1997)).

Since this case does not involve a criminal arrest, the facts do not fit neatly within the *Graham* framework. However, that framework and reasoning are informative, particularly as to the immediate threat factor. Under Eleventh Circuit precedent, "it is constitutionally reasonable for an officer to use deadly force when a suspect is threatening escape and possible harm to others," or when "he has probable cause to believe that his own life is in peril." *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005); *see also Kenning v. Carli*, 648 F. App'x 763, 767 (11th Cir. 2016) ("It is reasonable, and therefore constitutionally permissible, for

an officer to use deadly force against a person who poses an imminent threat of serious physical harm to the officer or others.").

Plaintiff argues that Knowles was not an immediate threat and, therefore, use of deadly force against her was unreasonable.[56] For support, Plaintiff points to allegedly contradictory statements by Officer Hart regarding Knowles's actions;[57] Officer Hart's statement to the GBI that he thought Knowles "was going over into the corner, like she was gonna get her gun out and take cover and start shooting";[58] the Joint Preliminary Report and Discovery Plan's statement that Officer Hart "shot and killed Knowles, without hesitation and without giving any warning";[59] the fact that Officer Hart did not shoot her again after thinking he had missed the first time;[60] and, the fact that he did not disarm her before resorting to deadly force.[61] In response to Plaintiff's argument, the Court emphasizes that "[o]ur task

---

[56] ECF 32, at 2.

[57] *Id*. at 4–6, 7–11. This argument was addressed *supra* note 32.

[58] ECF 32, at 6 (citing ECF 32-7 (Hart GBI Recorded Statement), at 15:50–16:00)).

[59] ECF 32, at 7 (citing ECF 4, ¶1(b)). The Court rejects this argument. The Joint Preliminary Report is not admissible evidence, as required under Fed. R. Civ. P. 56(c). Additionally, it was made prior to discovery and counsel's statement has since been shown to be inaccurate. ECF 25-5, ¶¶ 39, 48.

[60] ECF 32, at 14–15.

[61] *Id*. at 15–16.

is not to evaluate what the officers could or should have done in hindsight. The sole inquiry is whether the officer's actions, as taken, were objectively reasonable under all the circumstances." *Garczynski*, 573 F.3d at 1167; *see also Sheehan*, 135 S. Ct. at 1777 ("[A] plaintiff cannot avoid summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless."). Mindful of this framework, the Court is not persuaded by Plaintiff's argument that Officer Hart acted unreasonably under the circumstances. The undisputed facts show that upon observing that Knowles had a gun, Officer Hart warned Officer Goetz, told Knowles to show her hands, and drew his gun. At this point, Officer Hart's gun was pointed towards the floor, not at Knowles. Knowles ignored Officer Hart's instructions, got up off the bed, and was yelling and screaming. While Knowles was standing, Officer Hart saw her reach towards her gun, at which point he shot her. There was approximately a 15-second delay from when Officer Hart first commanded Knowles to show her hands and when he shot her. After she was shot, Knowles fell to the floor, began kicking and fighting, and continued to yell and

scream.[62] Eventually, the officers were able to handcuff Knowles and remove the handgun from her holster.

Officer Hart's statement that Knowles looked like she might move into the corner of the bedroom to take cover before starting to shoot only highlights his reasonable belief that Knowles was a dangerous and immediate threat. According to Plaintiff's expert, the approximate distance between the door to the bedroom and where Knowles was shot, near the corner of the bedroom, is seven feet.[63] Thus, any movement to the corner of the bedroom would not have interrupted the immediacy of the dangerous situation.

Officer Hart was faced with an imminently dangerous situation. He knew Knowles had taken significant amounts of medication, she had been yelling and screaming since the officers arrived at the scene, she had blood and an "evil" look on her face, she was not complying with Officer Hart's order to show her hands,

---

[62]   Plaintiff's argument that Officer Hart should have shot Knowles more than once is belied by the uncontroverted facts that Knowles fell to the floor after she was shot, giving Officer Hart a chance to rush to her and attempt to secure her gun. ECF 25-5, ¶ 49; ECF 32-9, ¶ 49. Officer Hart's decision not to shoot Knowles once she was on the ground does not show that his original shot was unreasonable. In fact, had he shot Knowles multiple times, Plaintiff would likely be arguing that such conduct was unreasonable because Knowles did not pose a threat after she fell to the floor.

[63]   ECF 10-1, at 7, 12.

and she had a gun readily available on her hip, which she appeared to be reaching

towards. It is undisputed that Officer Hart gave Knowles time to comply with his

demand to show her hands and she did not comply.[64] "This is exactly the type of

'tense, uncertain and rapidly evolving' crisis envisioned by the Supreme Court."

*Garczynski*, 573 F.3d at 1168 (quoting *Graham*, 490 U.S. at 397).

     In *Garczynski*, the plaintiff's wife enlisted the police to help her find her

husband. 573 F.3d at 1163. The police eventually found the plaintiff in his car. *Id.*

Some of the officers saw the plaintiff raise a gun to his temple. *Id.* There was a

factual dispute as to whether the plaintiff ever turned the gun to aim at the officers.

*Id.* at 1168. Nevertheless, the Eleventh Circuit held that "[e]ven if we assumed that

[the plaintiff] did not point his gun in the officers' direction, the fact that [he] did

not comply with the officers' repeated commands to drop his gun justified the use

of deadly force under these particular circumstances." *Id.* at 1169. The court found

that the officers' use of force did not violate the Fourth Amendment because they

reasonably believed the plaintiff posed an immediate risk of serious harm to

them. *Id.*

---

[64]   ECF 25-5, ¶ 48.

As in *Garczynski*, Officer Hart "did not have control over [Knowles] and there was nothing to prevent [her] from shooting at the officers in an instant." *Id.*; *see also Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."). The Court finds that Officer Hart's use of force did not violate the Fourth Amendment as a matter of law because it was reasonable under the circumstances.

### ii.    Clearly Established Right

Even assuming, *arguendo*, Plaintiff demonstrated a constitutional violation, Officer Hart would nonetheless be entitled to qualified immunity because the right was not clearly established. For a right to be clearly established, the contours of the right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778, (2014). To determine whether an official understood his conduct violated a constitutional right, the Court must analyze whether the law "at the time of the incident provided 'fair warning' to the defendant[] 'that [his] alleged [conduct] was unconstitutional.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

"Fair warning is commonly provided by materially similar precedent from the Supreme Court, this Court, or the highest state court in which the case arose." *Kenning*, 648 F. App'x at 770 (citing *Terrell v. Smith*, 668 F.3d 1244, 1256 (11th Cir. 2012)). Though the Supreme Court does not require a case with materially identical facts to determine whether the right was clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *al-Kidd*, 563 U.S. at 741). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments.'" *Sheehan*, 135 S. Ct. at 1774 (quoting *al-Kidd*, 563 U.S. at 743).

Clearly established law should not be defined at a high level of generality; rather, it "must be particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (citations omitted). "Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987)). If an officer's conduct falls in the "'hazy border between excessive and acceptable force," the conduct does not violate clearly established law. *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (*citing Saucier*, 533 U.S. at 206)).

Plaintiff has failed to show that Officer Hart violated clearly established law. Plaintiff cites to *Mercado*, *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015), and *Turk v. Bergman*, 685 F. App'x 785 (11th Cir. 2017) as establishing that an officer cannot shoot someone simply for being in possession of a weapon if it is not being brandished in a threatening manner. First, only *Mercado* was published prior to the events in this case. Therefore, only that holding can be said to have "clearly established" the principle put forth by Plaintiff. *See Turk*, 685 F. App'x at 789 ("[W]e examine clearly established federal law at the time of the shooting."). Second, those cases do not support such a proposition.

In *Mercado*, the plaintiff's wife called the police claiming that the plaintiff was suicidal. *Mercado*, 407 F.3d at 1154. When the police arrived at the plaintiff's apartment, they were told that the plaintiff was armed with a knife. *Id*. After failing to make verbal communication with the plaintiff from outside the apartment, the officers went in and found him sitting on the kitchen floor with a knife in both hands, pointed towards his heart. *Id*. The officers identified themselves and ordered the plaintiff to drop his knife at least twice (once in English, once in Spanish). *Id*. The plaintiff refused without making any threatening moves towards the officers. *Id*. The officers did not warn him that force would be used if he did

not drop his weapon. *Id*. One of the officers fired a Sage Launcher[65] at the plaintiff twice, from a distance of approximately six feet. *Id*. at 1154–55. The Sage Launcher hit the plaintiff once in the head, fracturing his skull and resulting in brain injuries. *Id*. The court found that the plaintiff in *Mercado* did not amount to an immediate threat, and, therefore, use of deadly force was unreasonable. *Id*. at 1157–58, 1160.

*Mercado* is easily distinguishable from this case for the same reasons the Eleventh Circuit pointed to in *Garczynski*. "The fact that [Knowles] was armed with a gun, rather than a knife, distinguishes this case from *Mercado*, where we concluded that a suicidal man holding a knife in his hands was not an immediate threat to officers . . . ." *Garczynski*, 573 F.3d at 1169 n.3; *see also Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016) ("[G]uns are different when it comes to the level and immediacy of the threat—for instance, a person standing six feet away from an officer with a knife may present a different threat than a person six feet away with a gun."). Here, Officer Hart was six feet away from a heavily medicated woman with a gun. Unlike the plaintiff in *Mercado*, Knowles posed an immediate

---

[65] A Sage Launcher is a less lethal munition that is designed to protect persons from self-inflicted injury. *Mercado*, 407 F.3d at 1155.

threat to Officer Hart. Thus, the holding in *Mercado* could not have provided notice to Officer Hart that his actions violated clearly established law.

Plaintiff claims that *Weiland* and *Turk* are relevant to our analysis even though they came out subsequent to the incident at issue here because "those cases hold that the law was already clearly established at the time of the shootings in those cases, which predated the shooting in this case."[66] However, *Weiland* did not make any holding regarding clearly established law. In *Weiland*, the court found that the plaintiff had adequately pled a Fourth Amendment violation where the complaint alleged that the officers, without warning, shot, tasered, beat, and assaulted a suicidal man who had a shotgun on his lap but had not made any threatening moves. *Weiland*, 792 F.3d at 1326–27. The Court did not address whether the law was clearly established in that case because the officers did not raise the qualified immunity defense. *Id.* at 1326 ("We limit our analysis to whether the allegations in Weiland's complaint are sufficient to state a claim upon which relief can be granted without regard to the qualified immunity defense.").

In *Turk*, an unpublished opinion that came out three years after the incident here, the Eleventh Circuit relies on *Mercado* and *Lundgren v. McDaniel*, 814 F.2d 600

---

[66]   ECF 32, at 20 n.4.

(11th Cir. 1987), as establishing that "as of January 9, 2014, the law was clearly established that a police officer may not use deadly force without warning against a person who was not committing a crime, resisting arrest, holding a weapon, or making any threatening moves." *Id.* at 789. This holding is vastly different from the one proposed by Plaintiff—that it is unconstitutional to shoot someone who "is in possession of a gun but is not brandishing it in a threatening manner."[67] Moreover, Knowles *did* make a threatening move by getting up and reaching for her gun after Officer Hart commanded her to raise her hands. Thus, Officer Hart did not violate clearly established law as stated in *Turk*.

The Court finds that Officer Hart did not violate a clearly established constitutional right. Accordingly, he is entitled to qualified immunity on Plaintiff's § 1983 claim. Officer Hart's motion for summary judgment as to Count IV is **GRANTED**.

### b.    Official Immunity for State Law Claims

The Complaint asserts Georgia law claims for battery, negligence, wrongful death, pain and suffering, and bad faith. In his motion, Officer Hart asserts various defenses including official immunity under Georgia law.[68] Since the Court finds

---

[67]   *Id.* at 21.

[68]   ECF 25-6, at 20.

that Officer Hart is entitled to official immunity, it will not address the other defenses he raises.

The Georgia Constitution provides official immunity for state employees protecting them from liability for injuries and damages caused in the performance of their jobs. Ga. Const. art. I, § 2, ¶ IX(d). However, state employees may still be held liable for the negligent performance of their ministerial functions and for discretionary actions taken with "actual malice or with actual intent to cause injury" in performance of their official functions. *Id*.; *Kidd v. Coates*, 271 Ga. 33, 33 (1999)). Plaintiff concedes that the use of deadly force by a police officer is a discretionary act.[69] Accordingly, both parties agree that Officer Hart is entitled to official immunity on these counts unless the evidence supports a finding of "actual malice or intent to cause injury."[70]

The Georgia Supreme Court has explained that "'actual malice' . . . denotes 'express malice,' i.e., 'a deliberate intention to do wrong,' and does not include 'implied malice,' i.e., the reckless disregard for the rights or safety of others." *Murphy v. Bajjani*, 282 Ga. 197, 203 (2007) (quoting *Merrow v. Hawkins*, 266 Ga. 390,

---

[69]   ECF 32, at 23.

[70]   *Id*. at 23; ECF 25-6, at 21.

391–92 (1996)). A "deliberate intention to do wrong" is defined as "the intent to cause the harm suffered by the plaintiffs." *Murphy*, 282 Ga. at 203. It requires "more than harboring bad feelings or ill will about another; rather, ill will must also be combined with the intent to do something wrongful or illegal." *Wyno v. Lowndes Cty.*, 305 Ga. 523, 531 (2019).

Similarly, an "actual intent to cause injury" refers to "an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury. This definition of intent contains aspects of malice, perhaps a wicked or evil motive." *Id*. (quoting *Kidd*, 271 Ga. 33). In *Kidd*, the Georgia Supreme Court held that if an officer shot an individual "intentionally and without justification, then [the officer] acted solely with the tortious 'actual intent to cause injury.'" *Kidd*, 271 Ga. at 33. Additionally, an officer who uses deadly force in self-defense under O.C.G.A. § 16-3-21(a) is entitled to official immunity. *Id*.

Plaintiff argues that Officer Hart was not acting in self-defense under O.C.G.A. § 16-3-21(a) because the statute requires that deadly force be used by a person who "reasonably believes that such force is ***necessary*** to prevent death or great bodily injury to himself or herself or a third person or to prevent the

commission of a forcible felony."[71] Accordingly, Plaintiff argues that *Kidd*'s holding regarding an officer's use of self-defense does not apply and Officer Hart is not otherwise entitled to official immunity.[72] Even assuming the viability of Plaintiff's argument that *Kidd* does not apply because Officer Hart's use of force was not "necessary," which the Court rejects, Officer Hart is still entitled to official immunity.

Plaintiff has failed to provide any evidence that shows Officer Hart acted with "actual malice" or with an "actual intent to cause injury." There are simply no facts from which a reasonable juror could find that Officer Hart's motive was to wrongfully cause harm to Knowles. Officer Hart used a reasonable amount of force under the circumstances to gain control over the intense and rapidly evolving situation and stopped using any force as soon as Knowles no longer posed a danger. *Cf. Mitchell v. Parker*, 271 F. Supp. 3d 1364, 1381 (N.D. Ga. 2017) (distinguishing between harm caused to plaintiff while officers are in process of apprehending plaintiff and harm caused after plaintiff is in officer's control; finding that latter could show actual malice or actual intent to cause injury). Nor can Plaintiff reasonably claim that Officer Hart harbored any sort of malice

---

[71]   ECF 32, at 22 (citing O.C.G.A. § 16-3-21(a)).

[72]   ECF 32, at 22–24.

towards Knowles. As Plaintiff notes in his Complaint, prior to the incident Officer Hart "had never met or spoken to [Knowles]."[73] Additionally, for the reasons already discussed, the Court finds that Officer Hart's actions were justifiable under the circumstances. Accordingly, the Court **GRANTS** summary judgment in favor of Officer Hart as to Plaintiff's state law claims on official immunity grounds.

## IV.    CONCLUSION

The Court **GRANTS** Officer Hart's Motion for Summary Judgment [ECF 25]. The Clerk is **DIRECTED** to enter judgment in favor of Officer Hart, each party to bear his own costs, and to close the case.

**SO ORDERED** this the 3rd day of April 2020.

_____
Steven D. Grimberg
United States District Court Judge

---

[73]   ECF 1, ¶ 13.